838 So.2d 807 (2002)
SPORT TECH, INC., Plaintiff-Appellant,
v.
SFI MANUFACTURING, INC., Outland Sports, Inc. and Robert D. Berkley, Defendants-Appellees.
No. 36,413-CA.
Court of Appeal of Louisiana, Second Circuit.
December 20, 2002.
Rehearing Denied January 23, 2003.
Writ Denied April 25, 2003.
*808 James Fleet Howell, Shreveport, for Appellant.
Jerald R. Harper, Shreveport, for Appellee.
Before STEWART, WILLIAMS and DREW, JJ.
DREW, J.
Sport Tech, Inc. appeals a judgment dismissing its breach of contract claim. We affirm the judgment.

*809 FACTS

In 1986, Steven Lenert and Coleman Brown formed a company named "Dove Creations" to develop various products. Lenert came up with the idea of creating a light hunting decoy constructed of the type of foam generally used to insulate beverage cans and pipes. A cut was to be made in the foam to allow the placement of a duck head silhouette. A simple prototype of Lenert's concept was made to show the material, but not to be placed on the market. On October 22, 1986, Lenert and Brown executed a record of invention for a "Decoy Lite" made of injected poly-foam rubber. Decoys to be made included "ducks, geese, dove, crow, owl, crane and coot."
Lenert called Herb Jeane, an old friend who was a sporting goods sales representative. Wanting to learn if Jeane had ever seen something similar on the market, Lenert showed Jeane his simple prototype. Jeane found the idea promising, so he arranged a meeting in 1987 with Robert Berkley, a plant engineer working for a toy company. Berkley, who was knowledgeable about the manufacturing process, would be able to assist with product development. Berkley and Jeane told Lenert that they could make a mold of a foam duck decoy that was similar in appearance to non-foam decoys on the market.
Berkley concluded that the decoys would have to be produced from polyethylene foam, so he began learning the process of using this foam to make the decoys. Dow Chemicals was the only company making this foam at the time, and Berkley found their materials to be inconsistent. Working at Snellings Thermovac plant in Blanchard, Berkley created a mold and had sample products constructed through vacuum forming. Berkley was assisted by Jeane, who offered ideas on what designs were most likely to sell.
Jeane testified that in November of 1987, Sport Tech sold a total of four dozen decoys to two stores in Monroe because they wanted feedback on the decoys. In early 1988, Lenert came up with a name for the decoys: "Feather Flex."
In January of 1988, Berkley, Jeane and Lenert attended the Shot Show in Las Vegas, taking 24 to 36 decoys with them and presenting them under the Feather Flex name. Jeane recalled taking orders for decoys at this show. They had a sign created which stated "Feather Flex Decoys," and Berkley allegedly placed a "TM" across the bottom of the sign. Berkley testified that he did this because he wanted some protection for the name and because he had been assured that the name would be trademarked. However, later during the trial, Berkley denied putting the "TM" on the sign, testifying that the sign instead stated, "Patent Pending."
At first, Berkley, Brown, Jeane and Lenert worked together as a general partnership named "Sports Nuts." Shortly after the 1988 Shot Show, they formed Sport Tech, Inc., with each receiving a 25% ownership stake. Lenert served as president. Brown handled the financing and taxes. Berkley was named vice-president of manufacturing.[1] Jeane was responsible for marketing the decoys. It was agreed around this time that Dove Creations would be paid a royalty of 5% of income by Sport Tech.
*810 On March 11, 1988, an agreement was reached between Berkley, Lenert and Sport Tech. The agreement recited that Berkley and Lenert were the inventors of the Feather Flex decoys and had a pending application for design and utility patents on the Feather Flex decoys. Berkley and Lenert warranted that the patent application was made for a game bird decoy known by the common law trademark name of "Feather/Flex Decoy." The decoys were bird-like designs thermoformed from polyolefin. Berkley and Lenert granted to Sport Tech the exclusive right to manufacture, market and distribute the Feather Flex decoys worldwide.
On May 8, 1989, Lenert and Berkley applied for a patent on a game bird decoy to be "formed from flat sheet stock of closed cellular foam, preferably, of polyethylene." The material would allow the decoy to be deformed for transport or storage and to return to its three-dimensional shape when unfolded or restraints were removed. The decoy would have an upper profile representative of the species, a waterline rim for surface resting of the decoy, a removable head and an open underside. The head was to be flexible and hollow, permitting mooring line and anchor weights to be stored there. The patent application was a continuation-in-part of a 1987 application that had been abandoned. The patent was granted on April 2, 1991. Berkley testified that this patent was never used because the design would not work.

Packaging Industries Group, Inc.
While attending a trade show in Atlanta in March 1988, Berkley sought a new supplier of foam materials because Dow had discontinued production. He approached John Bambara, the President of Packaging Industries Group, Inc. ("PI"), which produced foam materials, about supplying him with the foam. Bambara expressed an interest in manufacturing and marketing the foam decoys, so he began negotiations with Sport Tech. Berkley explained that at the time Sport Tech only had a viable idea, not a viable product. Because Sport Tech only had a single cavity tool to make the decoys, Sport Tech needed to convince a company to invest in the machinery and tools required to efficiently produce the decoys.
Under the terms of the March 11, 1988, agreement referenced above, Sport Tech had been given the right to convey, transfer and assign its rights. An agreement was signed between Sport Tech and PI on March 31, 1988. This agreement, prepared by PI, granted to PI the exclusive right to manufacture, market and distribute the Feather Flex decoys worldwide. PI became obligated to pay $150,000 and royalties of 5% of net sales to Sport Tech. PI was given the right to assign its rights and obligations under the agreement with Sport Tech's written consent, which could not be unreasonably withheld. This agreement would be binding on successors and assignees of the parties thereto.
The agreement between Sport Tech and PI provided that Sport Tech had "common law trademarked and service marked the Feather/Flex Decoys[.]" It further provided that Sport Tech owned or had applied for "common law trademark and/or trade name registrations." PI agreed to obtain "all new trademark registrations... necessary to increase the product line of Feather/Flex Decoys."
Berkley began working as the Operations Manager at PI's plant in Bossier City. He recalled that during the first year approximately 80% of the material sent by PI was rejected. Berkley eventually developed a system of splitting the material so he could get to the raw foam cells in order to manipulate them. The duck decoy was created first, followed by decoys *811 of geese and turkeys. Berkley stated that he designed injection-molding equipment, which was built in China and used in the production of the decoys.
In May of 1988, PI filed for Chapter 11 bankruptcy. The bankruptcy did not stop the production of the decoys as PI paid $25,000 and royalties through December 31, 1991, to Sport Tech. The agreement with PI was amended on May 10, 1991, to provide payments to Sport Tech of $200,000 and a reduced royalty of 3.5% of net sales commencing on April 1, 1991. Products covered by the amended agreement were (1) products in PI's 1991 Feather Flex brochure and (2) those products not displayed in the 1991 Feather Flex brochure but in existence for test purposes or otherwise, or contemplated by PI, to be marketed by PI under the Feather Flex trademark and/or trade name.

Q.P.I. Consumer Products Corporation
In March of 1993, PI was acquired by Quality Products, Inc. Feather Flex became a division of Q.P.I. Consumer Products Corporation ("QPI"), a wholly-owned subsidiary of Quality Products, Inc. QPI manufactured children's toys, hydraulic presses and hunting decoys. QPI continued to operate the former PI facility in Bossier City, and Berkley continued to supervise operations at the plant. During this period Berkley developed a deer decoy and bird decoys, such as doves and pigeons.
There was never any written agreement between QPI and Sport Tech, and Sport Tech never gave written consent to the assignment as required by the agreement with PI. Nevertheless, QPI paid royalties to Sport Tech for at least three quarters ($45,456 through February 1993) before ceasing royalty payments.
On May 27, 1993, Merritt Chastain, an attorney for Berkley, submitted a letter to James Renaldo of QPI on behalf of Berkley. Chastain wrote that Berkley was interested in purchasing the "equipment, inventory and rights to use the name `Feather Flex' and other associated assets" from QPI. Chastain requested all documents relating to any of the assets or rights of the Feather Flex Division. Gregory Tamborello, Senior Vice-President and Chief Operations Officer of Quality Products, Inc., responded on June 11, 1993. Tamborello wrote that Quality Products, Inc.'s intention was to "structure an asset sale which would include all machinery and equipment, inventories, customer lists and the rights to use the Feather Flex trade style." Among the documents included in his response were the 1988 agreement and 1991 amended agreement between Sport Tech and PI.
Berkley was unsuccessful in acquiring the Feather Flex line because he lacked the necessary financial resources.[2]

Sport-Flex
In 1995, Tamborello and Berkley joined forces and formed Sport-Flex, Inc. with the intent to purchase the Feather Flex product line.[3] Tamborello told Berkley that he thought they could accomplish this goal because QPI was having financial problems. Berkley owned 45% of Sport-Flex and Tamborello owned the remaining 55%. Tamborello was the president of Sport-Flex; Berkley was the vice-president of manufacturing.
On March 8, 1995, Berkley met with Brown, Jeane and Lenert to discuss *812 Sport-Flex's interest in purchasing the Feather Flex product line from QPI. Berkley told the others that he and Tamborello had an agreement in principle to buy it. Berkley also stated that he hoped the others would go along with reducing the royalty obligation on the Feather Flex line from the 3.5% paid by PI and (sometimes by) QPI to a 1% royalty. Brown, Jeane and Lenert rejected this proposal, although they were amenable to accepting a 1% royalty on non-decoy items bearing the Feather Flex name.
On March 25, 1995, a contract styled "AGREEMENT FOR SALE OF ASSETS" was executed by QPI and Sport-Flex. QPI conveyed to Sport-Flex certain assets relating to its Feather Flex division, namely, specific accounts receivable of Feather Flex (valued at $189,937.34) and its Feather Flex inventory as of March 17, 1995 (valued at $417,092.47). Sport-Flex agreed to pay the face value of the accounts receivable and the total value of the Feather Flex inventory. In addition, Sport-Flex agreed to lease the machinery and equipment used by QPI to manufacture the Feather Flex decoys. The agreement also contained a covenant not-to-compete prohibiting QPI, for a period of three years, from engaging in a business similar to or in competition with the business of Sport-Flex regarding the Feather Flex line of products. The agreement was amended four days later to modify the provisions concerning the amount of the accounts receivable. It was again amended in August 1996 to modify the lease provisions.
QPI declared Chapter 11 bankruptcy on August 25, 1995. Curiously, Sport Tech never filed a proof of claim in this bankruptcy for the unpaid royalties, and was never listed as a creditor in the bankruptcy. QPI was also never sued for unpaid royalties.

Trademark Registrations
On May 31, 1995, Sport-Flex filed an application for trademark registration of the mark, "FEATHER FLEX and Design." The application stated that the trademark was first used on goods and in interstate commerce as early as March 1993, with use of the mark by predecessor-in-title Q.P.I. Consumer Products Corporation.
On August 7, 1996, Sport-Flex filed an application for trademark registration of the mark, "FEATHER FLEX." The application again recited that the mark was first used on goods and in interstate commerce as early as March 1993, with the use of the mark by predecessor-in-title Q.P.I. Consumer Products Corporation. Tamborello believed that these were the same design and trademark that had been used by PI and QPI.
Sport-Flex continued to manufacture and sell decoys under the Feather Flex name. Berkley testified that he and Tamborello changed the Feather Flex artwork after registering the trademark. He added that he developed big game decoys, refined old products on an annual basis and began using different types of foam on some decoys.

Federal Court Proceedings
On April 8, 1996, Sport Tech filed a complaint for declaratory judgment, accounting, damages and injunctive relief against Sport-Flex and Berkley in the United States District Court for the Western District of Louisiana. Sport Tech asserted four causes of action in its complaint:
(1) copyright infringement;
(2) false designation of origin and false descriptiontrademark infringement;
(3) declaratory judgment that Sport-Flex had no rights in and to the *813 Feather Flex trademark and copyrighted artwork; and
(4) Berkley's breach of his fiduciary duty.
Attached to the petition as an exhibit was an October 1988 certificate of copyright registration with the United States Copyright Office showing that a copyright registration of artwork for "Feather Flex Decoys" had been made by Coleman Brown. Sport Tech's complaint was later amended to allege a fifth claim for relief: failure to pay royalties.
Sport-Flex and Berkley filed a motion for summary judgment. A judgment on this motion rendered on March 4, 1988, reveals that Sport Tech did not oppose Sport-Flex's motion for summary judgment insofar as it related to claims of trademark infringement and copyright infringement, but it opposed Sport-Flex's motion to the extent Sport-Flex, Inc. claimed it did not owe any royalties to Sport Tech. Accordingly, the court ordered that Sport Tech's trademark and copyright claims (the first, second and third causes of action) were dismissed with prejudice. Because the court had dismissed the federal claims and then had only pendent jurisdiction over the remaining state law claims of failure to pay royalties and breach of fiduciary duties, those claims were dismissed without prejudice.

Outland Sports, Inc.
On February 10, 1998, Sport-Flex entered into an asset purchase agreement with Outland Sports, Inc. Among the assets purchased were:
(1) all raw materials, works in process and finished goods inventory;
(2) all prepaid expenses;
(3) all vehicles, computers, software, equipment, molds, dies, tooling and supplies;
(4) all accounts receivable;
(5) all cash and cash equivalents;
(6) all of Sport-Flex's rights under any agreements relating to patents, copyrights, trademarks or other proprietary rights relating to the acquired business and all of Sports-Flex's rights under any other agreements relating to the acquired business;
(7) all trademarks and trade names (including the trademarks and trade names Feather Flex Decoys and Sport-Flex) owned or controlled by Sport-Flex or used in connection with the acquired business; and
(8) all patents, patent applications, copyrights and trade secrets owned or controlled by Sport-Flex or used in connection with the acquired business.
Outland agreed to pay $2,260,000.00, less escrow funds of $500,000.00, and assume liabilities including $543,687.42 owed to Guaranty National Bank. According to a separate escrow agreement, part of the escrow fund was set aside as litigation escrow to compensate Outland "for the impact of prospective royalty obligations (if any) owed to Sport-Tech[.]"
The representation/warranty section of the agreement has a subsection pertaining to intellectual property matters, which states:
(i) Attached hereto as Schedule 5(p)(i) is a true and accurate list of all patents, copyrights, trademarks, and trade names, both foreign and domestic, owned, licensed or used by the Company all of which are included in the Assets. The Company owns and will transfer to Buyer the entire right, title and interest in all such patents, copyrights, trademarks, trade names and service marks other than those that are the subject of an IP Contract described below.
*814 Attached as Schedule 5(p)(i) were United States trademark registrations for "FEATHER FLEX" registered on June 17, 1997 and "FEATHER FLEX," with feathers representing the letter "F," registered on January 7, 1997, as well as a Canadian registration of the trademark "FEATHER FLEX" registered on November 1, 1996.
Following the closing of the agreement, Sport-Flex changed its name to "SFI Manufacturing, Inc." Berkley agreed to provide consulting services to Outland.

State Court Proceedings
On May 21, 1998, Sport Tech filed suit in state district court against SFI Manufacturing, Inc., Outland Sports, Inc. and Robert Berkley. Sport Tech alleged that:
(1) Sport-Flex acquired from QPI the exclusive manufacturing and distribution rights to the Feather Flex product line as set forth in the original and amended agreements with PI;
(2) As assignee/purchaser of those rights, Sport-Flex became obligated to perform the obligations of its predecessors in title (PI and QPI) under the PI agreements; and
(3) Sport-Flex and Outland breached the agreements by failing to pay royalties and failing to provide verified financial statements disclosing the sales of Feather Flex products.
Sport Tech further alleged that Berkley breached the fiduciary duty he owed to Sport Tech.
In defendants' answer, Berkley filed a reconventional demand against Sport Tech, Lenert and Brown, alleging that Lenert and Brown breached the fiduciary duty owed to him.
Trial was held in this matter on September 25, 2000, and August 15, 2001. Judgment was rendered on January 3, 2002, rejecting all claims by all parties. In its reasons for judgment, the trial court stated:
To prevail on the contract claim plaintiff must prove by a preponderance that defendants were bound or could be said to have legally assumed the royalty obligation as originally set forth in the "Agreement" of March 31, 1988 between Packaging Industries Group, Inc. and Sport Tech, Inc. La. Civil Code art. 1823 states, "An obligee and a third person may agree on an assumption by the latter of an obligation owed by another to the former. That agreement must be made in writing...."
The March 3, 1995 agreement between Q.P.I and Sport-Flex was for the sale of assets only. No obligations were assumed therein by Sport-Flex. There is no evidence of any written agreement to which plaintiff and defendants were parties that would obligate the defendants to pay royalties to the plaintiff.
Sport Tech appeals only that part of the judgment denying its claim for royalties due to an alleged breach of contract. It does not appeal that part of the judgment denying its claim that Berkley breached his fiduciary duty.

DISCUSSION
The focus of Sport Tech's argument before this court is that Sport-Flex's actions in manufacturing and marketing decoys under the Feather Flex name violated Sport Tech's common law trademark rights acquired through its status as the first bona fide user. Sport Tech never applied for a trademark registration. There is a distinction between trade names and trademarks, as set forth in 15 U.S.C.A. § 1127:
The terms "trade name" and "commercial name" mean any name used by a *815 person to identify his or her business or vocation.
The term "trademark" includes any word, name, symbol, or device, or any combination thereof
(1) used by a person, or
(2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter,
to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.
(Our emphasis.)
While Sport Tech's claim that it possesses a common law trademark may be valid, the trademark aspect of the case may have been conclusively dealt with in federal court, where Sport Tech asserted five claims for relief in its original and amended petitions: copyright infringement, trademark infringement, a declaratory judgment that Sport-Flex had no right to the Feather Flex trademark and copyrighted artwork, breach of fiduciary duty, and failure to pay royalties. For reasons not evident in this record, Sport Tech's counsel at the time did not contest Sport-Flex's motion for summary judgment insofar as it related to the claims of trademark infringement and copyright infringement. Accordingly, the federal district court dismissed the copyright infringement, trademark infringement and declaratory judgment causes of action with prejudice.[4]
In any event, Sport Tech did not seek any relief based upon trademark infringement in its state court petition. Safeguarding against attempts by Sport Tech's counsel to enlarge the pleading through testimony and evidence regarding trademark ownership, Sport-Flex's counsel objected on the grounds that the trademark claims had been resolved in the federal court proceeding. The trial court allowed the testimony regarding trademarks for a limited purpose, as reflected in its reasons for judgment:
Regarding the common law trademark and/or licensing claims, some testimony was elicited and exhibits introduced at trial regarding intellectual property rights, but timely objection was made to prevent any enlargement of the pleadings and the objection was made general to any such testimony or evidence. The testimony was allowed for the limited purpose of "background" on the breach of contract issue. Also, as stated above, these issues were disposed of in federal court and are not before this court.
We are cognizant of the difficulties faced by Sport Tech's counsel on this appeal, who did not enroll as counsel in this matter until after the dismissal of the federal court proceedings and after Sport Tech rested its case in the state court proceedings. Nevertheless, the common law trademark claims have not been pled and are not before this court.
What is before this court is a breach of contract claim. The position of Sport Tech is essentially that Sport-Flex, by allegedly purchasing the license to manufacture and market the Feather Flex line of decoys from QPI, stepped into the shoes of PI and QPI and assumed their obligations under the 1988 agreement and 1991 amended agreement with PI. Sport-Flex answers that it did not purchase a *816 license from QPI, but only purchased assets and leased equipment.
Our review begins with Sport-Flex's 1995 agreement with QPI.[5] When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art.2046. Only when the agreement is unclear, ambiguous, or will lead to absurd consequences, should a court go beyond the written agreement to gather the parties' true intentions. State Dept. of Transp. and Development v. Unknown Owners, 27,150 (La.App.2d Cir.9/27/95), 661 So.2d 626, writ denied, 95-2497 (La.12/15/95), 664 So.2d 459.
Whether a contract is ambiguous or not is a question of law. NAB Natural Resources, L.L.C. v. Willamette Industries, Inc., 28,555 (La.App.2d Cir.8/21/96), 679 So.2d 477. In the case of ambiguity in a contract, where factual findings are pertinent to the interpretation of a contract, those factual findings are not to be disturbed unless manifest error is shown. However, when appellate review is not premised upon any factual findings made at the trial level, but instead is based upon an independent review and examination of the contract on its face, the manifest error rule does not apply. In such cases, appellate review of questions of law is simply whether the trial court was legally correct or legally incorrect. Lawrence v. Terral Seed, Inc., 35,019 (La.App.2d Cir.9/26/01), 796 So.2d 115, writ denied, 01-3134 (La.2/1/02), 808 So.2d 341; Spohrer v. Spohrer, 610 So.2d 849 (La.App. 1st Cir.1992).
The March 1995 agreement for sale of assets between Sport-Flex and QPI was clearly and explicitly limited to the acquisition of specific assets (inventory and accounts receivable), lease of equipment and a non-competition clause. The leased equipment enabled Sport-Flex to manufacture the Feather Flex decoys. The agreement does not include any acquisition by Sport-Flex of licensing rights, nor is there any assumption by Sport-Flex of an obligation to pay royalties.
La. C.C. art. 1821 provides that an obligor and a third person may agree to an assumption by the latter of an obligation of the former; to be enforceable by the obligee against the third person, the agreement must be made in writing. La. C.C. art. 1823 provides that an obligee and a third person may agree on an assumption by the latter of an obligation owed by another to the former; that agreement must be made in writing. Sport Tech stipulated that the March 1995 agreement does not contain any reference to a royalty agreement. Upon our review of this record, we cannot conclude that the trial court erred in ruling that the 1995 agreement was for the sale of assets only.
Even if this court looked past the clear and explicit terms of the agreement in order to determine the intent of QPI and Sport-Flex, our conclusion would be the same. Tamborello testified that the asset purchase agreement between QPI and Sport-Flex did not include the Feather Flex trademark or design. Tamborello remarked *817 that because he began working for QPI in April of 1993, he was not confident in exactly what assets were acquired by QPI and had to rely on what Renaldo told him about what QPI possessed. Thus, he wanted to purchase specific assets only and wished to avoid assuming any liabilities or obligations.
Marvin Bubley, who first represented Sport-Flex in March of 1995, drafted the 1995 agreement. He testified that the agreement was not written in any way to be an assumption of QPI's rights or obligations, nor was it written to obtain licensing rights. Bubley further explained that even though he felt the agreement clearly expressed that Sport-Flex was purchasing only the inventory and accounts receivable, he wanted to design the agreement to make it apparent that Sport-Flex was not assuming any liabilities under any royalty agreement.
Lenert stated that although there was no direct agreement between Sport Tech and Sport-Flex, Sport-Flex became obligated to pay the royalty when it purchased the product line from QPI. Lenert added that Berkley's attempt to reduce the royalty is what caused him to believe that Sport-Flex entered into an agreement with Sport Tech. Brown testified that he thought no new agreement needed to be made with Sport-Flex and that Sport-Flex would be operating under the agreement with PI. Brown explained that he believed that the March 1995 meeting with Berkley suggested that Sport-Flex was obligating itself to pay royalties. Jeane testified that he assumed that Sport-Flex would be obligated to pay royalties under the terms of the agreement with PI just as QPI had been obligated and had paid some royalties. Much assuming was going on.
Berkley testified that had he been successful in 1993 in acquiring the Feather Flex product line from PI, then he would have paid royalties to Sport Tech. He also expected to pay royalties at the time of the March 8, 1995, meeting, although he thought 3.5% was excessive and floated the idea of a 1% royalty. Berkley explained that he assumed at the time that Sport Tech had registered the Feather Flex trademark because his colleagues at Sport Tech had previously represented to him that they had registered it. Regardless of Berkley's belief regarding the status of a registered trademark at the time of the meeting, he lacked the authority at the time to even agree to a royalty obligation on behalf of Sport-Flex.[6]
Sport-Flex apparently felt that the trademark could be acquired outside the agreement through registration because it was believed that Sport Tech did not own it. Bubley testified that he hired the University of South Florida to conduct a trademark search for Feather Flex before the agreement with QPI was executed. Two listings were found. One listing was for a mattress company, which had been cancelled, and the other listing was for a fishing rod company. No company engaged in the sale of animal decoys had registered the trademark. Bubley knew at the time the agreement was executed that no trademark had been registered by Sport Tech. Thus, he believed that QPI was incapable of conveying a registered trademark because they did not have one.
Berkley testified that shortly after the 1995 agreement with QPI, Tamborello asked him if Sport Tech had protected the trademark. He further testified that he and Tamborello then hired an attorney in *818 Massachusetts, Richard Crowley, who told them the trademark had not been registered and asked them why they would consider paying royalties to Sport Tech because Sport Tech had nothing to convey. Tamborello testified that when Bubley told him that Sport Tech did not have a registered trademark, he did not tell Berkley about this at first. He then hired Crowley, an attorney more experienced in trademark and patent law, to do a more thorough search. Berkley testified that he wasn't involved in the negotiations with QPI.
In support of its assertion that Sport-Flex acquired Sport Tech's licensing rights from QPI, Sport Tech directs this court's attention to:
 the 1993 letter from Tamborello to Chastain,
 the covenant not to compete in the March 1995 agreement with QPI,
 testimony from the attorney who drafted the 1995 agreement,
 statements in Sport-Flex's trademark registrations that QPI was the predecessor-in-title, and
 a motion to compromise filed in QPI's bankruptcy.
The June 11, 1993, letter from Tamborello to Chastain was written in response to Berkley's overtures about purchasing equipment, inventory and the rights to use the Feather Flex name from QPI. Tamborello answered in this letter that QPI wished to structure an asset sale which included, among other things, "the rights to use the Feather Flex trade style." We emphasize that this letter was written almost two years prior to the 1995 agreement and, as such, provides no insight into exactly what Berkley and Tamborello desired to acquire from QPI in 1995.
The covenant not to compete prohibited QPI, for a period of three years, from competing with Sport-Flex "with reference to Feather Flex (TM) line of products." Sport-Flex was prohibited for a period of three years from competing with QPI "with reference to the products that [QPI] currently manufactures and/or sells, except for the Feather Flex (TM) product line." There are several other references to a "Feather Flex (TM) product line" in this non-competition clause.
Tamborello agreed that the non-compete clause cut off QPI's right to manufacture and market the Feather Flex decoys; otherwise, the inventory he purchased would be worth much less. Bubley denied that the purpose of the non-competition clause was to transfer licensing rights from QPI to Sport-Flex. He explained that the purpose was to designate which products either company could not sell, not to grant rights to sell. He added that the "TM" was used after Feather Flex in the non-competition clause as a descriptive term to identify the product line subject to the covenant not to compete. It was not used to designate a trademark. Bubley recalled that QPI's attorney used the "TM" to characterize the Feather Flex line of products.
Sport Tech contends that Sport-Flex's acquisition of Sport Tech's licensing rights from QPI was confirmed and acknowledged by Bubley at trial. The following excerpt of Bubley's testimony during examination by Sport Tech's counsel is reproduced in Sport Tech's appellate brief:
Q: Mr. Bubley, did I understand you correctly that you began representing Sport-Flex, Inc. or SFI Manufacturing, Inc., in 1995?
A: That's correct.
Q: You hadn't represented them before then?
A: No. No, sir.

*819 Q: Have you represented them continuously since then to the present date?
A: Yes, I have.
Q: So you're their retained counsel as we now speak?
A: Correct.
Q: Okay. Now, you gave testimony about exhibitDefendant's Exhibit Number Five, the agreement for sale of assets?
A: That's correct.
Q: Would you turn to Article Nine of that agreement and tell me if you inserted that clause in the contract?
A: Yes. That was a clause that was draftedcorrect, that was in the contract.
* * * * *
Q: So, as a result of those cross non-compete agreements in Article Nine, your client acquired the rightsthe licensing rights to manufacture, market and sell the Feather Flex decoy products?
A: Whatever rights went along with the assets being sold, that would be correct.
Q: Yes, sir. Thank you very much. Your clients didn't have those licensing rights prior to the execution of this agreement did they?
A: That was the purchase of thethe purpose of the agreement was to acquire those assets.
The answers given by Bubley cited by Sport Tech were taken out of context. First, we note the portion of Bubley's testimony deleted by Sport Tech's counsel in his brief and replaced by ellipses:
Q: Right. And was not the purpose of that clause to transfer the licensing rights of Feather Flex trademark line of products from Q.P.I. to your client?
A: No. That wasThe second paragraph of that clause indicatesit's a cross collateral covenant not to compete.
Q: Right.
A: The purchaser wasagreed not to sell certain things and the seller agreed not to sell certain. The first paragraph was put in thatas a means by to provide description or kind of adjective of what would qualify as a Feather Flex-type product and the seller would be refrained from selling.
Q: And why did you want the seller to be refrained from selling Feather Flex line of products in this agreement?
A: Because they werethey were providing or selling to Sport-Flex the inventory, the assets. So, we did not want them to sell those assetsto sell that inventory items.
Q: They were also selling your client the equipment necessary to manufacture the products
A: Right. They
Q: the Feather Flex products?
A: They were leasingthey were leasingCorrect. They were leasing under a machinery and equipment lease
Q: In honor of this
A: The right to produce those products. I'm sorry.
Q: No, I'm sorry. I didn't mean to interrupt you. So, your clients, under this agreement, got the equipmentthe rights to the equipment to manufacture the Feather Flex line of decoy products?
A: That is correct.

*820 Q: And they got the accounts receivable?
A: Specific rightsSpecific accounts receivable.
Q: Right. And under Article Nine they got an agreement from the seller not to manufacture and sell Feather Flex decoy products anymore?
A: Correct. And we in turn agreed not to sell any other products that Q.P.I. Consumer Products made.
Q: Except
A: Except
Q: What?
A: Except the Feather Flex type products.
Bubley clearly denied that the purpose of the non-competition clause was to transfer licensing rights. Bubley later stated:
Q: Is it not a fact, Mr. Bubley, that your clients wanted to acquire the licensing rights from Q.P.I. to manufacture, market and sell the Feather Flex decoys products under the trade name, Feather Flex, by theunder this Article Nine of the contract?
A: Well, there were no licensing rights which Q.P.I had which we were buying, otherwise, we'd have them transfer it to us. I mean there'd actually be some sort of transfer of licensing rights, trademarks, intellectual property law, whatever they had, but they hadthey did not have any sort of licensing rights that we were going to purchase or that they actually even had to transfer to us.
When Bubley's testimony is read in its entirety, it is apparent that he did not draft the agreement so as to acquire licensing rights from Sport Tech.
In its May 31, 1995, and August 7, 1996, applications to register the Feather Flex trademark, Sport-Flex stated that the Feather Flex trademark had first been used on goods and in interstate commere as early as March 1993 by a "predecessor-in-title, Q.P.I. Consumer Products Corporation." We disagree that this is evidence that Sport-Flex acquired licensing rights from QPI. It simply meant that QPI had previously used the trademark in commerce, but had not registered it. Moreover, this evidence is more relevant to the issue of trademark ownership, which is not an issue before this court.
Finally, Sport Tech directs this court to a "motion to compromise controversy with Sport-Flex" filed by QPI in its bankruptcy proceedings on May 20, 1996. This motion stated that QPI sold the Feather Flex product line to Sport-Flex, and the product line "involved equipment, patent and licensing rights used in connection with the production of decoys and related sports products." At the time, Sport-Flex and QPI were involved in a dispute over the usability of some of the inventory and the status of the equipment that was being leased. As a result of their dispute, Sport-Flex and QPI agreed to alter the terms of the equipment lease and to reduce the purchase price of the inventory from $417,092.47 to $267,347.53.
Bubley testified that the motion to compromise had been drafted by QPI's attorney. Bubley related that he did not see the motion before it was filed, and he noted that the motion's prayer for relief recited what the parties sought. Bubley claimed that he told the bankruptcy judge at the hearing on the motion that, although the prayer for relief was correct in the motion, the motion contained an error in its description of what was sold by QPI to Sport-Flex. Bubley also claimed that QPI's attorney amended the motion at the hearing. We note that the order granting the motion to compromise refers only to the purchase of inventory and lease of *821 equipment. In any event, the language used by QPI in the motion to compromise cannot alter the clear terms of the agreement for sale of assets.
Sport Tech's argument that Sport-Flex acquired Sport Tech's licensing rights to the Feather Flex trademark is unpersuasive.

Frivolous Appeal
Appellees contend that this appeal is frivolous and accordingly seek damages, costs and attorney fees. We disagree. This is a quite complicated area of the law. In any event, since appellees failed to appeal or answer the appeal, they would not be entitled to frivolous appeal damages, costs or attorney fees. See, La. C.C.P. art. 2133 and Hill v. Cloud, 26,391 (La. App.2d Cir.1/25/95), 648 So.2d 1383, writ not considered, 95-0486 (La.3/17/95), 651 So.2d 260.

DECREE
At appellant's costs, the judgment is AFFIRMED.
NOTES
[1] Berkley claimed that except for a white-tail fawn, he contracted for all of the master decoys to be built. He also claimed that he was the person primarily responsible for developing the manufacturing process, that he created the specifications for the materials used in the decoys, and that he was involved full-time in the designing and construction of the decoys.
[2] Apparently Berkley had earlier attempted to acquire the Feather Flex line from PI but had been told that QPI was already in the process of doing so.
[3] Sport-Flex later changed its name to "SFI Manufacturing, Inc."
[4] A federal court summary judgment (based upon the burden of proof and not lack of jurisdiction) is a final judgment for purposes of a subsequent state court plea of res judicata. Fust v. Fontenelle, 558 So.2d 715 (La. App. 4th Cir.1990).
[5] The 1995 agreement between QPI and Sport-Flex contains a choice of law provision stating the agreement is to be construed in accordance with Florida law. Neither party has cited Florida jurisprudence relative to interpretation of the contract. Sport-Flex cites Louisiana law. We note that Florida law on interpretation of contracts appears similar to Louisiana law. "When a contract is clear and unambiguous, the court is required to enforce the contract according to its plain meaning." Feldman v. Kritch, 824 So.2d 274 (Fla. 4th DCA 2002).
[6] Jeane testified that shortly before the first lawsuit was filed, Berkley approached him and said he had been authorized by Tamborello to offer a 0.5% royalty. Berkley denied this.